Gary M. Kushner
Scott D. Simon
Goetz Platzer LLP
One Penn Plaza, Suite 3100
New York, New York 10119
(212) 695-8100
gkushner@goetzplatzer.com
ssimon@goetzplatzer.com

Brian C. Dunning
Damián Vallejo
Dunning Rievman & MacDonald LLP
1350 Broadway, Suite 2220
New York, New York 10018
(646) 873-7522
bdunning@drmlaw.com
dvallejo@drmlaw.com

*Attorneys for Plaintiff*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SPLASHLIGHT HOLDING LLC,<br><br>          Debtor. | Chapter 11<br><br>Case No. 25-10277 |
| SPLASHLIGHT HOLDING LLC,<br><br>          Plaintiff,<br><br>v.<br><br>BOATHOUSE CAPITAL II LP,<br>BOATHOUSE CAPITAL III LP,<br>BOATHOUSE CAPITAL III<br>MANAGEMENT LLC, CHONG MOUA,<br>and BRIAN COOK,<br><br>          Defendants. | **COMPLAINT** |

Plaintiff Splashlight Holding LLC, Debtor and Debtor-in-Possession, by and through its

proposed special counsel, Dunning Rievman & MacDonald LLP, as and for its Complaint

1

against Defendants Boathouse Capital II LP, Boathouse Capital III LP, Boathouse Capital III Management LLC, Chong Moua and Brian Cook, alleges and states as follows:

## PRELIMINARY STATEMENT

1.      The purpose of this adversary complaint is to clarify the status of the BHC Defendants' purported priority rights in this Chapter 11 proceeding.  The BHC Defendants assert that all of their loans are secured by assets of the Debtor and therefore have priority over the claims of other creditors.  This is not so.

2.      In addition, the Debtor has multiple claims against the BHC Defendants, Defendant Moua and Defendant Cook relating to the actions they took in the prepetition period. Those claims include equitable subordination, breach of the covenant of good faith and fair dealing, breach of fiduciary duties, aiding and abetting breaches of fiduciary duty, and tortious interference with prospective economic advantage.

## JURISDICTION AND VENUE

3.      On February 12, 2025 (the "Petition Date"), Splashlight Holding filed a voluntary petition for relief from its creditors under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

4.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b). The underlying chapter 11 bankruptcy case is captioned *In re Splashlight Holding LLC*, (Case No. 25-10277).

5.      This adversary proceeding is a "core" proceeding to be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). Plaintiff consents to entry of final orders and judgment by the Court.

6.      Venue of the Debtor's Chapter 11 case and this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and legal predicates for the relief sought herein are §§ 502, 506 (a), 544, 550 and 551 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

8.      Plaintiff Splashlight Holding LLC ("Splashlight Holding") is a Delaware limited liability company authorized to do business in the State of New York. Its principal place of business is located at 75 Varick Street, Third Floor, New York, New York 10013.

9.      Defendant Boathouse Capital II LP ("BHC II"), a private equity fund, is a Delaware limited partnership. BHC II is a small business investment company ("SBIC") licensed by the Small Business Administration of the United States ("SBA"). As an SBIC, BHC III is authorized to borrow money from the SBA at favorable rates and then to make loans with those funds.  Its principal place of business is located at 353 West Lancaster Ave., Suite 200, Wayne, Pennsylvania 19087.

10.     Defendant Boathouse Capital III L.P. ("BHC III"), also a private equity fund and licensed SBIC, is a Delaware limited partnership. Its principal place of business is located at 353 West Lancaster Ave., Suite 200, Wayne, Pennsylvania 19087.

11.     Defendant Boathouse Capital III Management LLC ("BHC III Management") is a Pennsylvania limited liability company. Its principal place of business is located at 353 West Lancaster Ave., Suite 200, Wayne, Pennsylvania 19087. Collectively, BHC II, BHC III and BHC III Management will be referred to herein as the "BHC Defendants."

12.     Defendant Chong Moua ("Moua"), a managing partner of each of the BHC

Defendants, resides in Berwyn, Pennsylvania, and his place of employment is located at 353

West Lancaster Ave., Suite 200, Wayne, Pennsylvania 19087.

13.     Defendant Brian Cook ("Cook"), the former Group Chief Financial Officer of

Splashlight Holding, resides at 54 Riverside Drive, Apt 6A, New York, NY 10024.

## STATEMENT OF FACTS

### Splashlight Holding, Telmar and Helixa

14.     Today, Splashlight Holding is the holding company for a group of U.S. and

foreign businesses. All of Splashlight Holding's subsidiaries fall into one of two groups, the

Splashlight Companies or the Telmar/Helixa Companies.

15.     The Splashlight Companies are headed by Splashlight LLC ("Splashlight"), which

owns 100% of Mahogany Fine Foods and Catering LLC ("Mahogany"), Splashlight

Photographic & Digital Studios, LLC ("Photo & Digital"), and Splashlight Technologies LLC

("Technologies"). The Splashlight Companies have evolved into a premier visual content

provider, servicing global brands and numerous Fortune 500 companies, including Nike and

David Yurman, among many others.

16.     Photo & Digital provides state-of-the-art comprehensive production services for

still and film shoots, both in-studio at its facilities on Varick Street in New York City and on

location at outside venues. The Splashlight Companies provide versatile options across directing,

casting, production, and post-production aspects of various forms of media including film, print,

and internet. Mahogany provides catering and hospitality services to Photo & Digital clientele.

17.     The Telmar/Helixa Companies are headed by Telmar Parent Corporation

("Telmar Parent"), which is the sole shareholder of Telmar Group, Inc. ("Telmar Group") and

Helixa, Inc. ("Helixa"). Telmar Group's subsidiaries include Telmar Information Services Corp.

4

("Telmar Information"), Telmar HMS (Canada), Telmar Europe Ltd (UK), Telmar CEE Ltd

(NY) ("Telmar CEE"), Telmar International, Inc. (NY) ("Telmar International"), and Telmar

Communications, Inc. (NY)("Telmar Communications").

18.     In 2022, Telmar Parent acquired Helixa, Inc. ("Helixa"), an AI-powered audience

intelligence software-as-a-service, or SaaS, platform. The Telmar/Helixa Companies, marketed

today as a single platform known as TelmarHelixa, provide advanced advertising and media

planning solutions through a data-driven audience and media intelligence platform. The

combined company offers its clients around the world enhanced capabilities in digital and social

media analysis, enabling clients to gain deeper insights into audience behavior and optimize their

media planning strategies. Clients have access to a wide range of tools and thousands of global

data sets tailored for various media channels, improving campaign planning and execution.

***Boathouse Capital Lends Splashlight Holding Money to
Buy Telmar in 2018***

19.     In 2018, Splashlight identified Telmar Group as an attractive acquisition target,

with a complimentary set of services and an opportunity to expand the company's offering to its

clients. Telmar Group had a number of operating companies, most of which were outside of the

United States.

20.     Splashlight required financing in order to acquire Telmar. After many other

lenders declined to provide financing, Splashlight ultimately chose Boathouse Capital (the

investment company that created the BHC Defendants and manages their investments) to be its

lender.

21.     Splashlight Holding was formed on October 8, 2018, at the behest of Defendant

BHC II to facilitate the acquisition of Telmar Parent. At the time, Splashlight Holding had just

two members: LiiV LLC, which holds approximately 87.5% of its membership interests and is

owned equally by non-parties James Ingram ("Ingram") and Benoît Lagarde ("Lagarde"), with the remaining stake held by BHC II.

22.    On October 18, 2018, Splashlight Holding and certain of its subsidiaries (Splashlight, Technologies, Photo & Digital, Mahogany, Telmar Parent, Telmar Group, Telmar CEE, Telmar Communications, Telmar Information and Telmar International) entered into a Loan and Security Agreement with one of Boathouse Capital's SBIC funds—BHC II (the "2018 BHC II LSA").

23.    The 2018 BHC II LSA provided for a term loan for a maximum amount of $16,900,000.00. As required, Splashlight Holding used the proceeds from the 2018 BHC II LSA to acquire one hundred percent (100%) of the common stock in Telmar Parent.

24.    In connection with the 2018 BHC II LSA, BHC II was granted a security interest in all of Splashlight Holding's personal property and other assets, including but not limited to its receivables, equipment, fixtures, general intangibles, inventory, investment property, deposit accounts, cash, goods and all other tangible and intangible personal property.

25.    The 2018 BHC II LSA provided BCH II with the following:

a.    a security interest in 1000 shares of the capital stock in Telmar Parent, representing 100% of the duly issued and outstanding shares of Telmar Parent owned by Splashlight Holding.

b.    a security interest in 1000 shares of capital stock in Telmar Group, representing 100% of the duly issued and outstanding shares of Telmar Group owned by Telmar Parent;

c.    a security interest in 100 shares of Telmar International representing 100% of the duly issued and outstanding shares of Telmar International owned by Telmar Group;

d.    a security interest in 100 shares of Telmar Information, representing 100% of the duly issued and outstanding shares of Telmar Information owned by Telmar Group;

e.    a security interest in 100 shares of Telmar Communications, representing 100% of the duly issued and outstanding shares of Telmar Communication owned by Telmar Group;

f.    a security interest in 1 share of Telmar Cee, representing 100% of the authorized issue of common stock of Telmar Cee owned by Ingram.

g.    a security interest in 200 shares of Telmar Cee representing 50% of the authorized issue of commons stock of Telmar Cee owned by Telmar Group. (All together, the "Pledged Interests".)

26.    Also on October 18, 2018, Splashlight Holding and BHC II executed a limited liability company operating agreement ("OA") whereby the initial membership structure of Splashlight Holding became Liiv (87.25%) and BHC II (12.75%).

***Defendant Moua Joins Splashlight Holding's Board of Managers***

27.    Following the execution of the 2018 BHC II LSA, Moua joined Ingram (Chief Executive Officer) and Lagarde (President and Secretary) as a member of Splashlight Holding's board of managers. Moua was one of three managers of Splashlight Holding from 2018 until he resigned from the board in December 2024 due to his admitted conflicts of interest and stated inability to properly perform his fiduciary duties to Splashlight Holding.

***BHC II Increases its Equity Stake in Splashlight Holdings in Exchange for a Deferral of Interest on the 2018 BHC II LSA***

28.    On November 19, 2019, BHC II was granted the right to increase its equity stake in Splashlight Holding in consideration for the deferral of interest due under the 2018 BHC II LSA. In connection with Splashlight Holding's agreement to grant BHC II an increased equity stake, Splashlight Holding and BHC II entered into (i) an amended OA dated November 22, 2019 ("First Amended OA"); (ii) an amendment to the 2018 BHC II LSA dated November 22, 2019 ("Amended LSA"); and (iii) a subscription agreement dated November 23, 2019 ("Subscription Agreement").

*Splashlight Borrows $5,000,000 from Newtek to Fund*
*Telmar's Operations*

29.     Just a few months before the outbreak of the COVID-19 pandemic, Splashlight

Holding engaged CG Petsky Prunier, an investment banker, to try to sell Splashlight. By March

3, 2020, Splashlight Holding had secured a deal for refinancing its debt and paying off the 2018

BHC II LSA loan. The pandemic quickly put an end to that potential transaction.

30.     COVID-19 proved to be just as devastating to Splashlight Holding as it was to so

many other businesses around the world. First, it paused efforts to sell Splashlight Holding.

Second, the shutdowns hurt Splashlight's business, with Photo & Digital shut down completely.

Finally, it was impossible to secure the loan from Newtek Small Business Finance LLC

("Newtek") that it hoped to use to pay off its debt to BHC II.

31.     On or about December 18, 2020, Newtek provided an SBA loan to Technologies,

Photo & Digital and Telmar Information in the principal amount of up to $5,000,000 (the

"Newtek Loan"). The proceeds of the Newtek Loan were used to fund the replatforming of the

Telmar software.

32.     Splashlight Holding (and some subsidiaries of Splashlight Holding) guaranteed

the Newtek Loan.

*The Helixa Acquisition and the 2021 Term Loan*

33.     In or about July 2020, Moua alerted Ingram and Lagarde about a potential

merger/acquisition opportunity with Helixa, a data platform that works with media companies to

identify new opportunities and pathways to growth. Moua believed the combination of Telmar

and Helixa would accelerate growth and improve Telmar's competitive position.

34.    To facilitate the purchase of Helixa, Splashlight Holding reached out to dozens of potential lenders. All of the lenders turned Splashlight Holding down because a loan of this nature would cause Splashlight Holding to be overleveraged.

35.    The BHC Defendants and Moua were aware that Splashlight Holding was struggling to pay its debts and had already secured covenant default waivers and paid-in-kind interest accommodations.

36.    The BHC Defendants and Moua were fully aware that Splashlight Holding was unable to secure alternative funding to finance the purchase of Helixa. Despite this, the BHC Defendants agreed to issue a new loan to Splashlight Holding to finance the purchase of Helixa.

37.    By agreement denominated as an amendment to the 2018 BHC II LSA dated November 29, 2021, BHC II and BHC III (lending to Splashlight Holding for the first time), as co-lenders, lent Splashlight Holding and various operating subsidiaries, as co-borrowers, the new principal sum of $15,000,000 ("2021 Term Loan").[1] Upon information and belief, Newtek has asserted priority over BHC II and BHC III vis-à-vis the 2021 Term Loan.

38.    By Amended and Restated Limited Liability Company Agreement of Splashlight Holding LLC dated November 30, 2021 ("Second Amended OA"), the members of Splashlight Holding amended the OA and First Amended OA by granting certain rights and imposing certain restrictions on themselves and on the membership units in Splashlight Holding and by adjusting the membership structure. The actual equity structure of Splashlight Holding as of November 30, 2021, is Liiv (79%) and BHC II (21%).

---

[1]    The November 29, 2021, loan documents indicate that the 2021 Term Loan was funded by BHC II ($1,000,000) and BHC III ($14,000,000).

*Efforts to Subordinate the Newtek Loan*

39.     On January 27, 2022, Splashlight Holding and BHC II entered into a third

agreement denominated as an amendment to the 2018 BHC II LSA ("Third Amendment"). The

Third Amendment provided no new loan to Splashlight Holding. Pursuant to the Third

Amendment, BHC II and BHC III required, and Splashlight Holding agreed, to obtain a

subordination agreement from Newtek whereby Newtek would agree to subordinate its lien

position on, *inter alia*, Splashlight Holding's assets in favor of BHC II and BHC III.

40.     To the best of Splashlight Holding's knowledge, Newtek has not subordinated its

liens and security interest in favor of BHC II/BHC III. Upon information and belief, Newtek has

asserted priority over BHC II/BHC III vis-à-vis the 2021 Term Loan.

41.     In April 2022, with the 2021 Term Loan coming due, Splashlight Holding

retained BrightTower LLC ("BrightTower"), an investment bank, to find a purchaser for the

Splashlight Companies so that Splashlight Holding could pay off its debt. Splashlight Holding

received offers through BrightTower's efforts.

42.     On August 22, 2022, Splashlight Holding and BHC II entered into a fourth

amendment to the 2018 BHC II LSA ("Fourth Amendment"). The Fourth Amendment extended

the date by which Splashlight Holding was to obtain an acceptable subordination agreement from

Newtek, as well as extensions of applicable deadlines. The Fourth Amendment provided no new

loan to Splashlight Holding.

*Splashlight Holding's Financial Situation Worsens as*
*TelmarHelixa Revenues Fall Off*

43.     In June 2022, Splashlight Holding discovered that the former owners of Helixa

were secretly utilizing the engineering team at Helixa post-sale to develop a competing business.

Telmar commenced litigation to prevent further attempts by the former owners to undermine

Helixa's business. Although the litigation ultimately settled, the time, expense, and effort required by the litigation detracted from TelmarHelixa's ability to upgrade its products and remain competitive.

44.     What is more, the actions of the Helixa engineering team and the former owners delayed the release of TelmarHelixa's important new product, Discover 2.0.  Also, the time spent during the litigation stunted the integration between Helixa and the other Telmar Companies—a synergy that would have enabled what was a *de facto* merger to cut overhead and generate much needed cash flow to service the 2021 Term Loan and other debts.

> Helixa's primary source of information was through Twitter. Clients of TelmarHelixa became uncertain of Twitter's survival when it was purchased by Elon Musk and looked for sources of data from TelmarHelixa's competitors who were not reliant on Twitter for information. Many of Telmar's customers migrated elsewhere, causing the company's revenue to decline by 40%.

45.     Management recognized that due to the unanticipated events at TelmarHelixa and the magnitude of overleveraging, the Splashlight Companies would not be able to service their secured debt.

### *First Bridge Financing*

46.     On or about March 20, 2023, BHC III Management, as lender, and Splashlight Holding, Splashlight, Photo & Digital, Technologies, Mahogany, Telmar Parent, Telmar Group, Telmar Information, Telmar International, Telmar Cee, Telmar Communications, Helixa and Liiv, as co-borrowers, entered into a master business loan agreement ("BHC III Master Loan Agreement"). The terms of the BHC III Master Loan Agreement were less favorable than terms that another lender, Change Capital, had offered. Ultimately, the BHC Defendants insisted on making the loans themselves.

47.    Pursuant to the BHC III Master Loan Agreement, Splashlight Holding (together with each of the named co-borrowers) borrowed the sum of $1,500,000 ("BHC III Management First Bridge Loan"). The proceeds from the BHC III First Bridge Loan were used to finance operations between the time the Newtek credit expired and a new facility provided by Rosenthal & Rosenthal ("Rosenthal") in place.  The Newtek loan was repaid in full.

**_The Rosenthal & Rosenthal Revolving Loan_**

48.    On or about March 31, 2023, Rosenthal & Rosenthal, Inc. ("Rosenthal"), as lender, provided Photo & Digital, Technologies and Splashlight, as co-borrowers, a revolving loan up to a maximum of $4,500,000 ("Revolving Loan").

49.    By agreement dated April 3, 2023, Splashlight Holding guaranteed the Revolving Loan. In connection with the Revolving Loan, Splashlight Holding executed and delivered to Rosenthal (i) a general security agreement pledging a blanket lien and security interest in Splashlight Holding's assets ("Rosenthal Security Agreement"); and (ii) an Intellectual Property Security Agreement pledging a lien and security interest against Splashlight Holding's intellectual property as follows:

a.    Trademarks and domain names in the United States (Creative Intelligence), and

b.    Patents (Technologies for Enabling Analytics of Computing Events Based on Augmented Canonicalization of Classified Images).

50.    On March 30, 2023, in connection with the Revolving Loan, Rosenthal and Newtek entered into an intercreditor agreement with respect to the priority—as between Rosenthal and Newtek only—of the security interests each of them had in, _inter alia_, the co-borrower companies ("Rosenthal–Newtek Agreement"). In sum and substance, under the Rosenthal–Newtek Agreement, Rosenthal maintained a priority security interest and lien against accounts receivable of Splashlight Holding, if any, and each of the other co-borrower

subsidiaries, and Newtek maintained priority over all other assets of Splashlight Holding and the other co-borrower subsidiaries.

51.    On March 31, 2023, BHC II and Rosenthal signed an intercreditor agreement ("BHC II–Rosenthal Agreement"). Pursuant to the BHC II–Rosenthal Agreement, BHC II agreed to subordinate its security interest and lien in and to the accounts receivable of each of the co-borrower subsidiaries, if any. Pursuant to the BHC II–Rosenthal Agreement, Rosenthal agreed to subordinate its lien position against Splashlight Holding's other assets in favor of BHC II.

*Second Bridge Loan*

52.    On or about June 14, 2023, BHC III Management, as lender, and the same borrowers with respect to the BHC III First Bridge Loan, including Splashlight Holding, as co-borrowers, entered into a second Master Business Loan Agreement ("Second BHC III Master Loan Agreement").  Once again, the terms of the Second BHC III Master Loan Agreement were less favorable than terms that Change Capital had offered.  The BHC Defendants nevertheless insisted on making this loan, even despite the concerns of Boathouse Capital's CFO, Brian Adamsky, who was troubled by the fact that Chong and Cook were negotiating better terms than the two funds' limited partners had and, upon information and belief, without SBA approvals.

53.    Pursuant to the Second BHC III Master Loan Agreement, BHC III Management advanced loan proceeds in the amount of $1,600,000 (which was used by the co-borrower operating subsidiaries of Splashlight Holding) ("BHC III Management Second Bridge Loan"). BHC III Management further agreed to make additional loans in an aggregate amount of up to $2,500,000. No new loans were advanced to Splashlight Holding or the other co-borrowers after the initial BHC III Management loan of $1,600.000. Upon information and belief, although this

loan was made by BHC III Management, it was made using the personal funds of Moua, Cook and Jonathan Edmundson.

54.     By agreement dated June 14, 2023, BHC III Management and Rosenthal entered into an intercreditor agreement ("BHC III Management–Rosenthal Agreement"). Pursuant to the BHC III Management–Rosenthal Agreement, BHC III Management agreed to subordinate its lien and security interest in the accounts receivable of Photo & Digital, Technologies and Mahogany, if any, in favor of Rosenthal.

***Post-Default Efforts***

55.     On November 23, 2023, Splashlight Holding and BHC II entered into a First Forbearance Agreement and Amendment to Loan and Security Agreement ("Forbearance Agreement"). Pursuant to the Forbearance Agreement, BHC II agreed to temporarily forbear from exercising its rights and remedies against Splashlight Holding and Splashlight Holding Qualified Subsidiaries that were parties to the 2018 BHC II LSA. In consideration of BHC II's forbearance, Splashlight Holding agreed to engage in the potential sale of both the Splashlight Companies and the Telmar/Helixa Companies, and to provide BHC II other financial accommodations.

56.     In connection with the Forbearance Agreement, TelmarHelixa retained Stephens Inc. ("Stephens"), an investment bank recommended by BCH II, to find a buyer for the Telmar/Helixa Companies and/or to raise financing for the entire group of companies sufficient to exit the loans made by the BHC Defendants. Again, indications of interest were communicated to BHC II that it rejected as too low. Stephens was not able to raise replacement financing satisfactory to BHC II.

57.     Meanwhile, Moua pursued his own course of action for Splashlight Holding—a course of action designed to put the BHC Defendants' interests ahead of the company's. From

14

mid 2024 until Moua resigned from Splashlight Holding's board of managers in December 2024, the BHC Defendants, through Moua, engaged in clandestine/covert communications regarding potential merger, sale, and/or acquisition activities and/or debt opportunities of Splashlight Holding—intentionally excluding Ingram (its CEO) and Lagarde (its President) from those communications and information. Upon information and belief, Moua excluded Ingram and Lagarde so that he could negotiate transaction terms that favored the BHC Defendants over Splashlight Holding, of which Moua was a manager. Moua's conflict of interest is obvious.

58.    During the first half of December 2024, in his discussions with Ingram and Lagarde, Moua falsely denied engaging in any M&A, sale, or debt discussions with respect to TelmarHelix when, in fact, he was having discussions with multiple entities regarding a merger and sale, even covertly using Telmar/Helixa's management to conduct due-diligence, supply information, and conduct synergies and scenario planning for transactions, all in a self-dealing way, and excluding Ingram and Lagarde from the discussions. The evidence is clear that Moua's denials of such communications were false.

59.    ***Industrial Color.*** Industrial Color is a photographic production company that competes with Splashlight. During its initial process in 2022, BrightTower approached Industrial Color about a possible merger with or acquisition/purchase of the Splashlight Companies. This early approach faltered, as did a similar approach to Erie Street Capital of Chicago.

60.    In the summer of 2024, Splashlight Holding and Moua discussed reaching out to Industrial Color's CEO as well as its main shareholder and lender, Garmark. This was jointly discussed with BrightTower, which reached out to Garmark. Garmark told BrightTower there was some interest, but that it would not pursue a deal at the time, leaving open the possibility of

doing so later in the year. BrightTower communicated this to Splashlight Holding and, on a
separate call, discussed this with Moua.

61.     Moua then contacted Garmark directly to ask if that company might be interested
in pursuing a business combination with Splashlight Holding. He then told Splashlight Holding
that he had told BrightTower that he would deal directly with Garmark at this stage, and that
BrightTower's services were no longer required. In its engagement agreement, BrightTower had
the usual tail provision, but, upon information and belief, Moua convince BrightTower that the
tail would be useless because of the pending foreclosure. Moua represented to Splashlight
Holding that BrightTower agreed to this. ***Orendt Studios.*** Orendt Studios, a German company,
is one of Europe's leading corporate groups in the production of content, photography and
moving images. Lagarde and Orendt's CEO were professional acquaintances. In or about
September 2024, Orendt's CEO visited Splashlight's Studios with the Managing Partner of
Orendt's major investor, Beyond Capital Partners for a tour. During this meeting they both
expressed interest to Lagarde to pursue a potential transaction with Splashlight Holding.
According to the CEO, a private equity fund Beyond Capital Partners had invested heavily in
Orendt with the idea of expanding into the U.S. market. Both the CEO and Managing Partner
expressed interest in acquiring Splashlight to lead that effort.

62.     Orendt made a written offer to purchase Splashlight for $15,000,000 in a letter of
intent. When Moua learned of this offer, he insisted on speaking directly with the private equity
investor that was funding Orendt's growth plan. Purporting to act for Splashlight Holding, Moua
executed a non-disclosure agreement ("NDA") with Orendt Studios to facilitate discussions
about this opportunity. Because Moua was not an officer of Splashlight Holding and was just one
of three managers, he had no authority to sign the NDA on behalf of Splashlight Holding.

16

Splashlight Holding's CEO (Ingram) and President/Secretary (Lagarde) were entirely unaware of the NDA. Thereafter, upon information and belief, Moua instructed Orendt Studios not to communicate at all with Ingram and/or Lagarde regarding any potential M&A discussions.

63.    Meanwhile, Moua continued to communicate directly with Orendt Studios, withholding all information related to this potential transaction from Ingram and Lagarde. Upon information and belief, Moua's discussions with Orendt and its funder led them to believe that Orendt's original offer of $15,000,000 was too high. Orendt then submitted a revised offer for only $7.5 million.

64.    On December 5, 2024, Moua unilaterally decided not to pursue a potential sale of Splashlight to Orendt Studios, which decision he was not entitled to make on his own as he was only one of three managers, Ingram and Lagarde being the other two and a majority. Moua also told Ingram that if Splashlight Holding tried to pursue this possible transaction, he would take measures to block it. .

65.    ***Inspired Thinking Group ("ITG***"). ITG is a London-based company in the same market sector as Splashlight. In August or September of 2024, ITG contacted Ingram to discuss a possible business combination. Later, the CEO of ITG came to New York to meet with Ingram and Lagarde. At this time, the parties were discussing a purchase price of at least $10,000,000.

66.    After that meeting, ITG's mergers and acquisitions advisor asked to speak with Moua. After speaking with Moua, ITG indicated they would made an offer to purchase Splashlight between 2 to 3 times trailing twelve months EBIDTA, or roughly $10 to $15 million. Upon information and belief, Moua made statements to ITG that were intended to and did discourage it from making an appropriate offer.

68.     Efforts were also made to sell Telmar, including to the following companies:

69.     ***Beringer Capital.*** In approximately February 2024, Ingram discussed a possible business transaction with Beringer Capital, a private equity group in Canada. The Managing Partner at Beringer told Ingram that they were interested in purchasing TelmarHelixa and that they would seek approval from their investment committee to submit a letter of intent to buy it for approximately $29,000,000 to $35,000,000.

70.     Beringer's investment committee ultimately decided against making an investment of that size in TelmarHelixa—Beringer typically invests only in deals where it invests at least $50,000,000, and it viewed the TelmarHelixa deal as too small.

71.

72.     ***Audiense Ltd.*** In summer of 2024, Moua and Cook began communicating directly with GP Bullhound, a British investment bank which, at the time, was marketing a British company called Audiense Ltd. ("Audiense"), a direct competitor to Helixa, for a potential transaction with TelmarHelixa.

73.     During the summer and fall of 2024, Moua and Cook directed the Telmar leadership team to conduct due diligence and synergy planning for a potential Audiense transaction. Moua and Cook never disclosed the due diligence or synergy planning to Ingram or Lagarde and withheld from them material information related to this transaction.

74.     In the fall of 2024, Moua unilaterally decided not to pursue this opportunity, without discussing the potential terms or disclosing his decision (which he was not entitled to make on his own) to Ingram or Lagarde.

75.     Ingram and Lagarde were kept completely in the dark about those discussions. Had Ingram been aware of the Audiense discussions, he would have contacted Stephens and

18

Beringer to proposed to Beringer a joint purchase of Audiense and TelmarHelixa, which would have met its investment committee's criteria and given Splashlight Holding access to at least $50 million.

76.    ***Analytics IQ Acquirer's interest.*** Analytics IQ is a data company and slight competitor of TelmarHelixa. Unbeknownst to Ingram and Lagarde, in November 2024 Moua and Cook performed basic financial due diligence in connection with a possible acquisition of TelmarHelixa by the private equity company that had purchased or was going to purchase Analytics IQ. This information was hidden from Ingram and Lagarde and was only discovered recently.

77.    ***Ad Wanted***. Ingram had tried for some time to sell part of TelmarHelixa to Ad Wanted, a company that provides market information and technology solutions to businesses in the advertising sector. During its process, Stephens talked with Ad Wanted in April 2024, While these initial attempts stalled, Ingram and Lagarde later learned that Ad Wanted's investment banker contacted Moua in August-September 2024 to say that the company might have an interest in purchasing all or part of TelmarHelixa.

78.    Notwithstanding the fact that it was Ingram who had identified Ad Wanted as a potential partner and conducted early negotiations, Moua and Cook hijacked the second round of discussions and kept Ingram and Lagarde in the dark once again. Splashlight Holding has recently discovered that Moua and/or Cook negotiated and signed an NDA with Ad Wanted. Upon information and belief, these discussions were taking place at a time when, in response to questions by Ingram and Lagarde about whether there was any M&A activity, Moua claimed there was no such activity. These discussions did not result in a transaction of any kind.

*BHC Interferes with Day-to-Day Business Operations*

79.     In May 2024, the Forbearance Agreement expired. At this time, and with Cook's assistance, Moua began to assert near-complete control over TelmarHelixa's operations.

80.     In approximately June 2024, Moua pressured Ingram, CEO of TelmarHelixa to step back from active management of TelmarHelixa before the BHC Defendants exercised their rights and remedies to resolve the defaulted debt. Moua also cut Ingram's and Lagarde's salaries by nearly half.

81.     Moua demanded that Ingram step back from active management of TelmarHelixa or else he would not have a role in Splashlight Holding after the Defendants foreclosed on the defaulted debt. Under duress, Ingram reluctantly agreed to step back from active management. In July, 2024, Ingram announced to all TelmarHelixa employees that he would be stepping back from active management, although he never formally stepped down as CEO.

82.     Thereafter, from July through December 2024, Moua (who was not an executive of Splashlight Holding or any of its operating subsidiaries) participated in operational decisions and discussions during these weekly meetings with the TelmarHelixa leadership team, including other TelmarHelixa senior executives who previously reported directly to Ingram—Sally Parratt, Christine Burke, Tom Murray, Naomi Powell, and Brian Cook—to discuss and direct TelmarHelixa's finances, business operations, and personnel, including the recruitment of C-level and other executives, directing whom to interview, and attending some of the CEO interviews.

83.     Moua was given access to the TelmarHelixa leadership team's shared drive in an effort to facilitate the sharing of documentation.

84.     In the fall of 2024, TelmarHelixa leadership interviewed four CEO candidates for TelmarHelixa. Upon information and belief, it was Moua himself who referred all of the potential CEO candidates to Telmar.

85.     Moua additionally attended some of the CEO interviews and/or contributed to the evaluation of the candidates.

86.     Also during the fall of 2024, the operating companies owned directly or indirectly by Splashlight Holding were unable to restructure or refinance their debts, obtain capital from a strategic partner, or sell their assets—in part due to the actions or inactions of BHC II, BHC III, BHC III Management and Moua, their designated appointee to Splashlight Holding's board of managers.

87.     In December 2024, according to Splashlight Holding's records, in an apparent effort to cover his tracks Moua attempted to decline calendar invitations for the meetings in which he participated unbeknownst to Ingram and Lagarde—*months after he had already attended them*.

88.     The Defendants additionally worked through Cook, Group Chief Financial Officer of Splashlight Holding, who was also a lender to Splashlight Holding. (Moua and Cook are co-lenders in the BHC III Management Second Bridge Loan that was extended to Splashlight Holding in 2023.)

89.     From this time forward, Moua and Cook communicated constantly about the day-to-day business of Splashlight Holding. Moua enlisted Cook and Splashlight Holding's finance team to perform extensive and time-consuming due diligence work for potential M&A activities that Moua failed to disclose to Ingram and Lagarde.

90.   Moua, who was never an officer or employee of Splashlight Holding, and Cook essentially ran the TelmarHelixa entity since Moua coerced Ingram into stepping back from TelmarHelixa in June 2024.

***Threats of Foreclosure***

91.   In the fall of 2024, the Defendants and Splashlight Holding continued to discuss strategies for resolving Splashlight Holding's precarious financial situation. Through Moua, during these discussions the BHC Defendants repeatedly threatened to foreclose on Splashlight Holding's collateral.

92.   Ingram, Lagarde and Cook had daily phone calls with Splashlight Holding's counsel to discuss potential resolution and a foreclosure strategy.

93.   During this time, the BHC Defendants  began to utilize Cook as an instrument of malfeasance. In that regard, there is abundant evidence that Cook acted as if his primary function was to protect the Defendants' economic interests (and not those of Splashlight Holding) and he performed his duties as CFO in furtherance solely of the Defendants' and his own interests as a creditor since he is party to the BHC III Management Loan.

94.   Among other things, Moua and Cook engaged in covert communications reflecting their intentions to have the BHC III Second Bridge Loan repaid prior to the repayment of Splashlight Holding's other creditors, including BHC II, BHC III and Newtek. In furtherance of this effort, Cook did at least the following things in breach of his fiduciary duties:

   a.   Failed to keep the majority of the Company's board of managers fully informed of certain potential merger and/or acquisition opportunities and/or the status of such opportunities;

   b.   Failed to disclose to the majority of the Company's board of managers the existence and substance of regular weekly meetings of the so-called Boathouse Capital/Telmar Leadership Team which took place from July to December 2024 and were regularly attended by Boathouse Capital's

22

      admittedly conflicted Board Manager, Chong Moua, Mr. Cook, and at least four other Telmar executives;

c.      Shared Company confidential and proprietary information with third-parties without Company authorization;

d.      Regularly sent Company confidential and proprietary information to his admittedly personal, non-Company email account with no credible explanation;

e.      Withheld essential information related to TelmarHelixa business activities from the majority of the Company's board of managers including, but not limited to, engaging in meetings related to the potential hiring of executives and relocating TelmarHelixa to a new office space; and

f.      Instructed TelmarHelixa to pay his deferred 2023 bonus in the amount of $37,500 at a time in October 2024 when he knew TelmarHelixa was under severe cash pressure (including considering the possibility of bankruptcy), and without making a request for that payment to Telmar's CEO or the Company's board of managers.

95.      During this time, on at least one occasion, Moua told Ingram and Lagarde that if Newtek fell into line by agreeing to subordinate its loan to theirs, the BHC Defendants would lend Splashlight Holding more money to help resolve its cash flow problems.

96.      Upon information and belief, the Defendants never intended to fulfill this promise or lend any additional money to Splashlight Holding.

97.      On December 12, 2024, BHC II notified Splashlight Holding that it would no longer forbear from foreclosing on the Pledged Interests.  .

98.      In January 2025, BCH II noticed a public non-judicial sale of the Pledged Interests and various intercompany notes owed by Splashlight Holding's affiliates/subsidiaries to Splashlight Holding.

***Splashlight Holding Files a Chapter 11 Proceeding***

99.      As described above, the operating companies owned by Splashlight Holding were facing significant distress and financial hardship for several years due to overleveraging,

highlighted by the toxic 2021 Term Loan which was utilized to acquire Helixa in 2022. In addition to committing to a $15,000,000.00 loan to purchase Helixa that carried with it a short payoff term (just 20 months), other factors contributed to TelmarHelixa's financial troubles.

100.   Splashlight Holding filed a voluntary petition for relief under Chapter 11, Title 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on February 12, 2025 (the "Petition Date") to stay the non-judicial foreclosure auction sale scheduled by BHC II for February 13, 2025 at 10:00 a.m. Eastern Time ("Auction").

101.   In connection with the Auction, BHC II sought to sell (A) (i) all Splashlight Holding's shares of capital stock, membership interests, and all other equity interests in Telmar Parent and (ii) all Splashlight Holding's membership units and all other equity interests in Splashlight (collectively, the "Pledged Equity Interests"); and (B) (i) all of the right, title and interest of Splashlight Holding in and to a certain intercompany promissory note by Photo & Digital in favor of Splashlight Holding; (ii) all of the right, title, and interest of Splashlight Holding in and to a certain intercompany promissory note by Telmar Parent in favor of Splashlight Holding; (iii) all of the right, title, and interest of Splashlight Holding in and to a certain intercompany promissory note by Telmar Parent in favor of Splashlight Holding; and (iv) all of the right, title, and interest of Splashlight Holding in and to a certain intercompany promissory note by Telmar Group in favor of Splashlight Holding (collectively, the "Intercompany Notes").

## **FIRST CAUSE OF ACTION**

### **EQUITABLE SUBORDINATION PURSUANT TO
§ 506 OF THE BANKRUPTCY CODE**

102.    Splashlight Holding repeats and realleges each and every preceding paragraph as if fully set forth herein.

103.    On or about October 18, 2018, BHC II made the 2018 BHC LSA loan to Splashlight Holding (and other co-borrower qualified subsidiaries) in the amount of $14,000,000 on the closing date, which would be increased to a maximum of $16,900,000 provided such subsequent advance was made by December 31, 2019.

104.    As security for the 2018 BHC LSA loan, Splashlight Holding granted a security interest to BHC II in certain assets of Splashlight Holding (and other co-borrower qualified subsidiaries) as security for all of the "Secured Obligations," as defined in the 2018 BHC II LSA.

105.    The definition of "Secured Obligations" in the 2018 BHC II LSA is:

> Borrower's obligations under this Agreement and any Loan Document (other than the Holding LLC Agreement), including any obligation to pay any amount (including, without limitation, the Make-Whole Amount) now owing or later arising (other than the Holding LLC Agreement).

106.    Accordingly, the 2018 BHC II LSA did not contain a future advances clause (other than a commitment to loan up to $2,900,000 post closing provided that such advance was made by December 31, 2019).

107.    On or about October 18, 2018, BHC II filed a UCC-1 financing statement in the State of Delaware, purportedly evidencing its security interest against the assets of Splashlight Holding as granted under the 2018 BHC II LSA term loan.

108.    Thus, BHC II's security interest in Splashlight Holding's assets (and in each of the co-borrowers' assets) attached to the $14,000,000 loan made on the closing date under the

2018 BHC LSA, plus any additional $2,900,000 advance (or any part thereof), provided it was made by December 31, 2019.

109.    On or about November 29, 2021, BHC II and a new entity, BHC III, made new loans to Splashlight Holding in the amounts of $1,000,000 and $14,000,000, respectively ("2021 Term Loans").

110.    No UCC-1 financing statement was filed by BHC II or BHC III in connection with the 2021 Term Loan.

111.    As a new loan, BHC II and BHC III were required to file a new UCC-1 financing statement in connection with the 2021 Term Loan to perfect a security interest in the assets of Splashlight Holding (and the other co-borrower qualified subsidiaries).

112.    On or about February 17, 2025, BHC II, as administrative agent and collateral agent under the 2018 BHC II LSA filed a motion pursuant to §§ 361, 362, and 363 (r) of the Bankruptcy Code requesting adequate protection (the "Adequate Protection Motion").

113.    In connection with the Adequate Protection Motion, BHC II alleges, *inter alia*, that as of February 12, 2025 (the "Petition Date") the "Term Loan Lenders," the identities of which are not disclosed, are owed not less than $46,298,313.12, plus accrued and unpaid interest, fees, costs, expenses, and other obligations (collectively, the "Prepetition Term Loan Obligations").

114.    Upon information and belief, the Prepetition Term Loan Obligations include sums due to BHC II and BHC III under the 2021 Term Loan.

115.    Pursuant to the Adequate Protection Motion, the Term Loan Lenders are asserting a first priority security interest in and continuing lien on substantially all of Splashlight

Holdings' (and each of the co-borrower qualified subsidiaries') assets and properties, including the Pledged Interests (the "Prepetition Collateral").

116.    Splashlight Holdings contends that the 2021 Term Loan is unsecured and that BHC II and BHC III do not hold a valid secured claim pursuant to § 506(a) of the Bankruptcy Code on account of their failure to file a UCC-1 financing statement in Delaware prior to the Petition Date.

117.    Based on the foregoing, Splashlight Holdings requires a determination of the extent, validity and/or priority of the liens asserted by BHC II and BHC III.

**SECOND CAUSE OF ACTION**

**(AVOIDANCE OF UNPERFECTED LIEN PURSUANT
TO 11 U.S.C. §§ 544, 550 AND 551)**

118.    Splashlight Holding repeats and re-alleges each and every preceding paragraph as if fully set forth herein.

119.    BHC II, BHC III, and BHC Management III failed to properly perfect their purported liens on, and security interests in, the assets of Splashlight Holding by failing to file UCC-I Financing statements.

120.    Pursuant to §§ 544(a)(1) and (2) of the Bankruptcy Code, Splashlight Holding, as debtor and debtor-in-possession, has the right and power of, as of the Petition Date, and without regard to any knowledge of itself or of any creditor, or may avoid any transfer of property of Splashlight Holding, or any obligation incurred by Splashlight Holding that is voidable by:

    a.  a creditor that extends credit to a debtor at the time of the commencement of this case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such creditor exists; or

    b.  a creditor that extends credit to a debtor at the time of the commencement of this case, and that obtains, at such time and with respect to such credit, an

extension against a debtor that is returned unsatisfied at such time, whether or not such creditor exists.

121.    In this case, BHC II, BHC III, and BHC Management III  failed to perfect their purported liens on the Pledged Assets in compliance with the UCC.  Accordingly, any lien and security interest granted under the 2021 Term Loans and/or the BHC III Management Second Bridge Loan is avoidable pursuant to §§ 544(a)(1) and (2) of the Bankruptcy Code.

122.    Because BHC II, BHC III, and BHC Management III do not have properly perfected liens on or security interests in the Pledged Interests, any and all liens on and security interests in the Pledged Interests asserted by BHC II, BHC III, and BHC Management III should be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property or value of such property should be recovered by Splashlight Holding's estate pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of its estate pursuant to section 551 of the Bankruptcy Code.

### THIRD CAUSE OF ACTION

**DETERMINATION OF THE PRIORITY, VALIDITY
AND EXTEND OF LIENS AND SECURITY
INTERESTS**

123.    Splashlight Holding repeats and re-alleges each and every preceding paragraph as if fully set forth herein.

124.    In the Adequate Protection Motion, BHC II alleges that it holds a valid lien and security interest in the assets of Splashlight Holding as collateral for repayment of a secured claim of not less than $46,298,313.12, plus accrued and unpaid interest, fees, costs, expenses, and other obligations.

125.    Splashlight Holding disputes the validity, extent, and amount of BHC II's secured claim.

126.    There is an actual and justiciable controversy between Splashlight Holding and

BHC II and BHC III as to the validity of their claims that the 2021 Term Loan is secured by

property of Splashlight Holding.

127.    Splashlight Holding is entitled to a declaratory judgment pursuant to 28 U.S.C.

§ 2201 that the 2021 Term Loan is not secured by property of Splashlight Holding or otherwise.

### FOURTH CAUSE OF ACTION

**EQUITABLE SUBORDINATION OR
DISALLOWANCE OF THE DEFENDANTS' CLAIMS
PURSUANT TO §510(C) AND 105(A) OF THE
BANKRUPTCY CODE**

128.    Splashlight Holding repeats and realleges each and every preceding paragraph as

if fully set forth herein.

129.    The Defendants engaged in and benefited from inequitable conduct that resulted

in injury to Splashlight Holding's creditors and conferred an unfair advantage to Defendants.

This inequitable conduct has resulted in harm to Splashlight Holding and its entire creditor body

because general unsecured creditors are less likely to recover the full amounts due to them.

130.    Defendants' conduct has been inequitable, egregious, unconscionable and/or

outrageous and has harmed Splashlight Holding, its employees, creditors and other stakeholders.

In equity and good conscience, any claim or interest of Defendants in respect of Splashlight

Holding's estate should be equitably subordinated pursuant to Section 501(c) of the Bankruptcy

Code and/or disallowed to the fullest extent permitted by law. Equitable subordination as

requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## FIFTH CAUSE OF ACTION

### FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING (FORBEARANCE AGREEMENT)

131.    Splashlight Holding repeats and realleges each and every preceding paragraph as if fully set forth herein.

132.    Like all contracts, the Forbearance Agreement includes a covenant of good faith and fair dealing.

133.    The Forbearance Agreement required Splashlight Holding (and its co-borrower subsidiaries) to work with Stephens to market and sell Splashlight.

134.    Splashlight Holding (and its co-borrower subsidiaries) worked with Stephens to market and sell Splashlight.

135.    The Defendants took actions, described above, to interfere in Splashlight Holding's efforts to market and sell Splashlight Holding, including by hijacking negotiations, keeping Ingram and Lagarde away from and uninformed about Defendants' activities, and causing several qualified bidders' proposals to be terminated.

136.    Upon information and belief, the Defendants acted in this matter in order to protect their interests over and above the interests of Splashlight Holding (and its co-borrower subsidiaries).

137.    The failure to consummate a transaction with a third party led to the insolvency and bankruptcy of Splashlight Holding.

138.    Splashlight Holding has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### FOR BREACH OF FIDUCIARY DUTIES AGAINST
### DEFENDANT COOK

139.    Splashlight Holding repeats and realleges each and every preceding paragraph as if fully set forth herein.

140.    As Chief Financial Officer of Splashlight Holding, Defendant Cook owed fiduciary duties to Splashlight Holding. Among other things, these duties included a duty of care, a duty of loyalty, and a duty of confidentiality.

141.    By collaborating with the BHC Defendants and Moua to search for solutions to Splashlight Holdings financial challenges in ways that favored the interests of the BHC Defendants, Moua and Cook over those of Splashlight Holding, Cook violated his fiduciary duties to Splashlight Holding.

142.    Cook's breaches of his fiduciary duties contributed directly to the insolvency and bankruptcy of Splashlight Holding.

143.    As a direct and proximate consequence of Cook's breaches of his fiduciary duties, Splashlight Holding has suffered damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### FOR AIDING AND ABETTING BREACH OF
### FIDUCIARY DUTIES AGAINST THE BHC
### DEFENDANTS AND MOUA

144.    Splashlight Holding repeats and realleges each and every preceding paragraph as if fully set forth herein.

145.    The BHC Defendants and Moua knew that, as its Chief Financial Officer, Cook had fiduciary duties to Splashlight Holding.

31

146.    By their actions, including but not limited to their recruitment of Cook to exclude

Ingram and Lagarde from company management and to take control of the company with no

authority to do so, the BHC Defendants and Moua aided and abetted Cook in breaching his

fiduciary duties.

147.    As a direct result of the BHC Defendants and Moua's aiding and abetting Cook's

breach of his fiduciary duties, BHC Defendants and Moua caused Splashlight Holding to become

insolvent.

148.    As a consequence of the harm BHC Defendants and Moua caused Splashlight

Holding to suffer, they are liable to it for damages in an amount to be proven at trial

## EIGHTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE
### ECONOMIC ADVANTAGE AGAINST BHC
### DEFENDANTS AND MOUA (ORENDT STUDIOS)

149.    Splashlight Holding repeats and realleges each and every preceding paragraph as

if fully set forth herein.

150.    The BHC Defendants and Moua tortiously interfered with prospective economic

advantage by secretly engaging in merger and acquisition discussions with Orendt Studios and

then terminating those discussions when, upon information and belief, Orendt Studios proposed

business terms that would have been acceptable for Splashlight Holding but which the

Defendants believed were not favorable for the BHC Defendants.

151.    Orendt Studios, one of Europe's leading corporate groups in the production of

content, photography and moving images, contacted Lagarde to discuss a potential merger with

or acquisition of Splashlight Holding. Splashlight Holding executed an NDA with Orendt

Studios to facilitate exploring this opportunity.

152.     Thereafter, upon information and belief, BHC Defendants, through Moua, instructed Orendt Studios not to communicate directly with Splashlight Holding, Ingram and/or Lagarde regarding any potential merger and acquisition discussions. BHC Defendants and Moua continued to communicate directly with Orendt Studios, withholding all information related to this potential transaction from Splashlight Holding, Ingram and Lagarde.

153.     On December 5, 2024, without first notifying Splashlight Holding, Defendants unilaterally decided not to pursue a potential sale to Orendt Studios without discussing the potential terms or disclosing this decision to Splashlight Holding.

154.     Defendants' conduct effectively prevented Splashlight Holding from pursuing the opportunity with Orendt Studios. These actions directly and proximately caused the loss of prospective business opportunity presented by Orendt Studios.

155.     Splashlight Holding has suffered damages as a direct and proximate result of Defendants' tortious interference with the prospective contract with Orendt in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE
### ECONOMIC ADVANTAGE AGAINST BHC
### DEFENDANTS AND MOUA (ITG)

156.     Splashlight Holding repeats and realleges each and every preceding paragraph as if fully set forth herein.

157.     ITG is a London-based company in the same market sector as Splashlight. In August or September of 2024, ITG contacted Ingram to discuss a possible business combination. Later, the CEO of ITG came to New York to meet with Ingram and Lagarde. At this time, the parties were discussing a purchase price of at least $10,000,000 to $15,000,000—two or three times Splashlight's 12-month trailing EBITDA.

158.    After that meeting, ITG's mergers and acquisitions advisor asked to speak with

Moua. After speaking with Moua, ITG made an offer to purchase Splashlight for just $2.5

million. Upon information and belief, Moua made statements to ITG that were intended to and

did discourage it from making an appropriate offer.

159.    As a direct result of Moua's tortious interference, which is imputed to the BHC

Defendants, Splashlight Holding was damaged in an amount to be proven at trial.

### TENTH CAUSE OF ACTION

### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST BHC DEFENDANTS AND MOUA (AD WANTED)

160.    Splashlight Holding repeats and realleges each and every preceding paragraph as

if fully set forth herein.

161.    Ingram had tried for some time to sell part of TelmarHelixa to Ad Wanted, a

company that provides market information and technology solutions to business in the

advertising sector. While Ingram's initial attempts stalled, Ad Wanted's investment banker

contacted him again in the fall of 2024 to say that the company might have an interest in

purchasing all or part of TelmarHelixa.

162.    Notwithstanding the fact that it was Ingram who had identified Ad Wanted as a

potential partner and conducted early negotiations, Moua and Cook hijacked the second round of

discussions and kept Ingram and Lagarde in the dark once again. These discussions did not result

in a transaction of any kind. Splashlight Holding has recently discovered that an NDA was

negotiated and signed by Moua and/or Cook, neither of whom had the authority to sign it.  Upon

information and belief, statements made by Moua and/or Cook discouraged Ad Wanted from

pursuing a transaction with Splashlight Holding.

34

163.     As a direct result of Moua and Cook's tortious interference, which is imputed to the BHC Defendants, Splashlight Holding was damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Splashlight Holding respectfully requests that this Court grant the following relief:

a.  A determination of the extend, validity and/or priority of the liens asserted by BHC II and BHC III, pursuant to the First Cause of Action;

b.  Avoid any and all liens on and security interests in the Pledged Interests asserted by BHC II, BHC III, and BHC Management III pursuant to section 544(a) of the Bankruptcy Code and recover such property Splashlight Holding's estate pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of its estate pursuant to section 551 of the Bankruptcy Code, pursuant to the Second Cause of Action;;

c.  a declaratory judgment pursuant to 28 U.S.C. § 2201 that the 2021 Term Loan is not secured by property of Splashlight Holding or otherwise, pursuant to the Third Cause of Action;.

d.  A declaration that the BHC Defendants' purported liens are invalid, pursuant to the Fourth Cause of Action;

e.  A declaration that the BHC Defendants' purported liens are subordinated or disallowed, pursuant to the Fifth Cause of Action;

f.  An award of damages to Splashlight Holding and against Defendants for breach of the covenant of good faith and fair dealing, for an amount to be determined at trial, pursuant to the Sixth Cause of Action;

g.  An award of damages to Splashlight Holding and against Defendant Cook for breach of his fiduciary duties, for an amount to be determined at trial, pursuant to the Seventh Cause of Action;

h.  An award of damages to Splashlight Holding and against the BHC Defendants and Moua for aiding and abetting Cook's breach of his fiduciary duties, for an amount to be determined at trial, pursuant to the Eighth Cause of Action;

i.  An award of damages to Splashlight Holding and against Defendants for tortious interference with prospective economic advantage regarding a potential transaction with Orendt Studios, for an amount to be determined at trial, pursuant to the Ninth Cause of Action;

j.    An award of damages to Splashlight Holding and against Defendants for tortious interference with prospective economic advantage regarding potential transaction with ITG, for an amount to be determined at trial, pursuant to the Tenth Cause of Action;

k.    An award of damages to Splashlight Holding and against Defendants for tortious interference with prospective economic advantage regarding potential transaction with Ad Wanted, for an amount to be determined at trial, pursuant to the Eleventh Cause of Action;

l.    An award of such other and further relief as the Court may deem just, equitable, and proper.

Dated:    New York, New York
          March 4, 2025

_____
Brian C. Dunning
Damián Vallejo
DUNNING RIEVMAN & MACDONALD LLP
1350 Broadway, Suite 2220
New York, New York 10018
(646) 873-7522
bdunning@drmlaw.com
dvallejo@drmlaw.com

*Proposed Special Counsel for Plaintiff Debtor and Debtor-in-Possession*

Gary Kushner
Scott D. Simon
GOETZ PLATZER LLP
One Penn Plaza, Suite 3100
New York, New York 10119
gkushner@goetzplatzer.com
ssimon@goetzplatzer.com
(212) 695-8100

*Attorneys for Debtor/Debtor in Possession*